**Jesse L. JACKSON, Plaintiff,**

v.

**MPI HOME VIDEO, Maljack Productions, Inc., and Fusion Video, Defendants.**

**No. 88 C 6476.**

United States District Court, N.D. Illinois, E.D.

Aug. 16, 1988.

484

Henry L. Mason, III, Sidley & Austin, Chicago, Ill., for plaintiff.

Robert Breisblatt, Welsh & Katz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

### I

#### Findings of Fact

*Stipulated Facts* [1]

Plaintiff Jesse L. Jackson ("Jackson") is a resident of Chicago, Illinois, and Defendant Maljack Productions, Inc. ("Maljack") is an Illinois corporation also doing business as MPI Home Video with its principal place of business in Oak Forest, Illinois.

The Democratic National Committee believes that Jackson is a major spokesman for the party. He delivered an address on July 19, 1988 at the 1988 Democratic National Convention, held in Atlanta, Georgia, on July 18–21, 1988. He wrote the speech himself in his hotel room on July 19, the day of its delivery.

---

1. These stipulations were entered into for purposes of the Preliminary Injunction Hearing.

The address was carried live by four television networks, A.B.C., N.B.C., C.B.S. and C.N.N., as part of their scheduled prime time coverage of the Democratic National Convention. Over 2,000 news organizations attended the convention. Copies of the address (Exhibit 1 without Jackson's handwritten additions) were provided to the press at the convention prior to its delivery on July 19, 1988. Between 100 and 150 copies of the address which were distributed to the press and the Democratic National Committee did not contain a copyright notification but did contain the following statement: "NOT FOR PUBLIC USE UNTIL DELIVERED."

On July 25, 1988, Maljack purchased from Sherman Grinberg Film Libraries, Inc., New York, New York, a license to use the A.B.C. news archive tape of Jackson's convention speech. Maljack paid $6,750.00 for the license. Shortly thereafter defendants began marketing a tape for home video use containing the complete A.B.C. news coverage of the convention speech given by Jackson.

The packaging of defendants' videotape displays among other items (1) a photograph of Jackson and his name, (2) two quotations from the speech, (3) a description of the tape as containing the "entire stirring Democratic National Convention speech, uncut and unedited" and (4) the name of MPI Home Video.

During the period from July 25–27, 1988 Waleed Ali, the President of Maljack, was interviewed on television news programs in Chicago. As part of the news story, the programs showed MPI Tape package and also showed excerpts of the plaintiff's convention speech.

The Democratic National Committee received a copy of Jackson's speech from Jackson's campaign headquarters which copy lacked a copyright notice. The Democratic National Committee received copies of speeches given by other speakers at the convention. Not a single copy received from any speaker bore a copyright notice. The Democratic National Committee has received numerous requests from political groups and news media around the country for video tape copies of Jackson's speech. Copies of those speeches have been distributed without copyright notice. So too Democratic National Committee has distributed copies of the speech received from Jackson's campaign headquarters.

The Democratic National Committee received $9.22 million from the federal government for the convention.

An application for copyright in the speech was filed with the Register of Copyrights on July 28, 1988.

*Further Findings of Fact*

Maljack's Ali heard Jackson's speech as it was being broadcast and, before it was over, formed an opinion that it would sell. He caused a license to be purchased from Grinberg Film Libraries which sent a master copy of the A.B.C. coverage of the Jackson speech and secured a photo of Jackson from Wide World Photos to be used on the videotape package or sleeve. Commercials and other extraneous materials were edited from the A.B.C. master, and packaging artwork was prepared. About eight thousand tapes and sleeves were prepared. Prior to the act of this Court restraining distribution, about 7,100 units (tapes in sleeves) were shipped and about 1,000 remain with Maljack. Ali believed he could ship at least 25,000 units and, at most, 50,000 units. The list price of a unit is $14.95, Maljack sells it to its wholesalers and others for about $7.50. Maljack's profit is about $3.00 a unit. Maljack publicized release of the tape with announcements to general newspapers and the trade press.

Maljack had prior dealings with Grinberg Film libraries because it distributes some A.B.C. video cassettes and other material secured from the library. Indeed, Maljack sought a lower price for the Jackson speech since in a previous transaction Maljack paid a large fee for material that had poor sales. Maljack's catalogue is wide ranging including feature films, concert films, film classics, television series, and children's features. There are cassettes explaining public issues. These include works on political figures, the Vietnam con-

flict, World War II, the various branches of the United States armed forces, the 1960's, the exploration of space, and a series of one-hour presentations of the speeches of King, Roosevelt, Churchill, Eisenhower and Kennedy. Ali credibly testified that he had distributed at least one film because he believed it contained an important message on poverty in America though he expected little or no profit. The catalogue also lists films whose titles suggest a more esoteric appeal.

The license contract received from Grinberg contained in capital letters the legend:

LICENSED FOR:
VCS .......... HOME VIDEO CASSETTES
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| SRC | ROLL NO. | KEY NUMBERS | SCENE DESCRIPTION |
|-----|----------|-------------|-------------------|
| 01 ABC | | | JESSE JACKSON CONVENTION SPEECH |

In smaller letters near the bottom of the contract it was written: "The film footage licensed hereunder may be used only for the purpose specified ... [T]he Licensor warrants nothing except its title to the footage licensed and that the licensee assumes full responsibility for any use which it may make of such footage."

The Wide World Photos, Inc. sales form states in large letters:

PHOTOS: JESSE JACKSON & JFK

FOR USE ON HOME VIDEO/JACKET FOR RETAIL

Toward the bottom of the form, in small letters, it is written of the picture sold:

"It may not be used in such a manner as to violate the rights of any person, firm or corporation. It may not be used for advertising or purposes of trade unless written consent of each living person depicted ... shall be obtained ..."

The intended meaning of the Grinberg contract is subject to dispute. A.B.C. licenses Grinberg to license others. A.B.C. may withhold whatever it wishes, but unless it specifically restricts use, Grinberg may license whatever A.B.C. gives them. The written agreement between them provides that Grinberg "shall have the right ... to make duplicates of A.B.C. film/cas-settes and license said duplicates to third parties for stock footage purposes." In a deposition taken after the filing of this lawsuit and after discussions about the issue with an A.B.C. lawyer, Chertok, who runs Grinberg, said that he had never told Maljack that there were any limitations on the use of the tape. Chertok then testified "All we had done was license a physical copy of some A.B.C. news coverage to Mr. Ali's company. We had not given him any rights to the content." This may be Chertok's sincere belief today, but as a statement of what the parties believed at the time of the transaction, it appears incredible. Absent some license to the content, the transaction was the right to use a copy of A.B.C. footage for over $6,000, an unaccountably high price for a single video cassette and a marked departure from their prior dealing.

Under the circumstances here it is clear that Maljack thought it bought and Grinberg thought it sold a valid license to duplicate and sell copies of the A.B.C. tape.

Ali testified that were a royalty to be paid on a tape such as this one it would be 50 to 75 cents a unit with an outer limit of one dollar. He noted that a tape including Jackson's 1984 speech at the Democratic National Convention sold about 4,000 units. Jackson stated in testimony that in 1984 he had authorized the distribution of such a tape for which he had received compensation.

The Democratic National Committee claims no copyright for the nominating convention. There are no agreements with the media covering the event that allocate rights with respect to the use of films or reports of the speeches and other occurrences at the convention. The Committee has no role in the accreditation of news correspondents to the convention (save for minor exceptions not relevant here). Its only agreements with A.B.C. dealt with physical locations and accommodations at the convention. Advance texts of speeches, which are in common use for news media at the convention, are not copy-

righted.[2] The Jackson speech was originally given in the form of a computer disc to the Committee press office before the speech; the Jackson staff wanted quick distribution and gave no direction as to whom copies might be given.

The Democratic National Committee considers its conventions to be public events of political and historical significance. It sends out copies of speeches to news persons and others requesting them, and has sent out copies of Jackson's speech and is still doing so. It also has tapes of the convention and intended to prepare and distribute a highlights film. This project is delayed pending the outcome of this case. So, too, the Committee has not distributed tapes of Jackson's speech in response to requests for them from the news media.

Jackson testified that the "essence" of his speech was "news" occurring at an "historical event." He imposed no restrictions on its use by the news media including some which printed all of the speech. He desired the speech to receive the widest possible audience. He has not objected in the past to the use of his photograph on the cover of news magazines.

After the speech was delivered at the convention various copies, all without copyright notification, were issued. Many of these were issued by the plaintiff's own national campaign office. A paid receptionist there distributed a hundred and fifty copies without copyright notification and did so at a time (July 25–28) when it was clear plaintiff intended to seek formal copyright protection. She had, in fact, been asked by plaintiff's attorney whether the speech did have copyright notification, and she replied that it did. In fact she mistook the small union printer label for a copyright notification, and neither any plaintiff's attorney nor any campaign official sought to verify her assertions about copyright notice. For some period of time she was not even made aware of plaintiff's objections to the defendant's tape—she referred callers seeking the tape to defend-ants. Much the same problem occurred at the Democratic National Committee. One of the plaintiff's attorneys requested on July 26 or 27 that the Committee cease distribution of Jackson's speech without copyright notification. It can be safely inferred that this request was not honored. Plaintiff's attorney repeated the request and was told that the Committee was aware of the problem and that it would stop—this conversation occurred on August 8.

It is agreed that no effort was made to recover the copies distributed without notification or to notify their recipients of the existence of copyright. Nor were computer discs containing the speech altered to add the copyright notification.

Shortly before or shortly after Maljack began distribution of the tape Jackson became aware of its project and stated, publicly, his objection to the project. In television interviews Ali made statements in response to Jackson's protests. The substance of his remarks was (1) Jackson did not authorize the tape because Ali did not ask him to do so, (2) Jackson was not involved in any aspect of the project, and (3) it was permissible for Maljack to profit from the words of a public figure.

### Analysis and Conclusions of Law

The Court, on a motion for preliminary injunction should grant the motion when plaintiff has shown (1) a better than negligible probability of success on the merits, (2) irreparable injury, (3) lack of serious adverse effect on defendants, and (4) the injunction is not inconsistent with public interest. *A.J. Canfield v. Vess*, 796 F.2d 903, 906 (7th Cir.1986).

The most difficult question in this case is the probability of success on the merits, and it will be discussed last. Analysis of the other three aspects assumes, *arguendo* that plaintiff has a valid copyright and the use of his photograph on the videotape

---

2. The Committee distributes very little copyrighted material, but material prepared for it by outside organizations is sometimes copyrighted as was the Committee's own convention book.

The Democratic National Committee had no policy regarding the issues presented by this case, but its director of communications said such a policy is needed and will be adopted.

package has a tendency to deceive the public into believing he sponsors or is associated with defendant's enterprise.[3]

## II

### Irreparable Injury

■ Irreparable injury "may normally be presumed from a showing of copyright infringement." *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir.1982). The market for plaintiff's own product is diminished and perhaps foreclosed by an infringing tape. The existence of an unauthorized tape may not simply reduce the sales of an authorized tape in direct proportion to its own sales; it may, if enmeshed in controversy, reduce the total number of sales for any tape by deterring buyers unwilling to purchase the unauthorized tape and uncertain of which tape is authorized. In this respect money damages may not be adequately determinable. For purposes of the Lanham Act, the existence of a tendency to deceive (by virtue of the design of the tape package) is sufficient to show irreparable injury. *Black Hills Jewelry v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir.1980).

## III

### Adverse Effect on Defendants

The adverse effect on the defendants of a preliminary injunction is speculative. There is no evidence as to the time span of the market for their videos although it is reasonable to assume that the end of the 1988 presidential election campaign may signal the end of the market for the tape. The decision on the question of the final injunction will be reached within three or four weeks, well short of that date. In any event defendants have not shown that sales will be reduced by a short additional delay in their distribution.

## IV

### Consistency with the Public Interest

Protection of copyright and prevention of practices which have a tendency to deceive are clearly consistent with the public interest in the creation of other original works fostered by copyright protection and in the avoidance of deception of the public. Moreover, failure to protect copyright (by denying the preliminary injunction) is inconsistent with the public interest.

Defendants argue that an injunction is inconsistent with the public interest because the principle on which it must rest, *i.e.*, copyright in campaign speeches, will create enormous problems for news reporting of political events. The argument rests on speculation. The problems in this case may well have been avoided had the copyright implications been considered in advance as the testimony now indicates they are being considered. The possible resolutions of such problems are quite varied. Among other possibilities, Congress could amend the copyright law removing protection from candidate speeches or setting specific royalties, and party committees could require speakers to waive copyright in order to gain the podium. Media could negotiate royalty arrangements with political candidates as they do with other individuals (and the media do not lack bargaining power), or the whole problem could be ignored on the assumption that very few persons would ever have the desire or the occasion to assert copyright to stop reproduction of political speeches. And, of course, the fair use doctrine sanctions for purposes of "criticism, comment, news reporting, teaching ... scholarship or research" the use of a reasonable amount of copyrighted material. 17 U.S.C. § 107.

## V

All of what was just said depends quite clearly on the validity of the copyright and deception claims of plaintiff, or on his abili-

---

**3.** I reject here as I did at the hearing on the temporary restraining order the claim that plaintiff is damaged by association with other tapes in the defendant's catalogue. There is no reasonable inference of any danger the public associates with each other the products of a single videotape distributor.

ty to show he has a better than negligible probability of success on their merits.

### A

■ The defendants argue that their videotape is protected by the First Amendment. There is no direct support for this claim. *Time, Inc. v. Bernard Geis*, 293 F.Supp. 130 (S.D.N.Y.1968) does not rest upon the First Amendment. To the extent it rests upon the idea that copyright must yield where "there is a public interest in having the fullest information available in the murder of President Kennedy", it is probably inconsistent with *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). There the respondents sought to diminish copyright protection because of the "substantial public import of the subject matter" of the Ford memoirs (on the pardon of former President Nixon), 471 U.S. at 556, 105 S.Ct. at 2228. The Court said, in response, "It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public." 471 U.S. at 579, 105 S.Ct. at 2240. This language is fatal to the defendants' First Amendment argument. The distinction between the "words" involved in *Harper & Row* and the "news photo" exception advocated by Professor Melville Nimmer (1 *Nimmer on Copyright* 1.10[C]) is one not recognized by the Copyright Act which allows in equal measure the protection of words and pictures. 17 U.S.C. § 102(a)(1), (5), (6). In any event, Nimmer's suggested examples of what would lose copyright protection because they fit under a "news photo" exception—photographs of My Lai massacre and the John Kennedy assassination—do not seem to be comparable in degree or quality to a film of a candidate for public office giving a speech. *See Nimmer on Copyright* 1.10[C]. And, of course, defendants seek to use both the picture and the words. Defendants use Nimmer's suggestion that copyright is lost when, for example, "a public official's scathing denunciation of a rival—replete with obscenities or social epithets—would have to be reproduced verbatim in order to fully apprise the public of

its content ..." Nimmer on Copyright 1.10[D]. This observation is simply inapposite to the speech here. Finally, there is, on the basis of the evidence more than a negligible probability that plaintiff can show he earns part of his living by being paid for his oratory—as he has been in the past—and this may invoke the rule in *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) which found no First Amendment protection for a news film embodying Zacchini's "entire act."

### B

■ The defendant says that his videotapes are within the fair use provision of the copyright laws. 17 U.S.C. § 107. There is more than a negligible probability they are not. The statute sets out four factors to be considered.

(1) The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.

The evidence supports the defendants' contention that their purpose was news reporting for profit. The plaintiff's argument against this is weak. Reports of events of past weeks or months, even if previously reported, are yet news. News reporting is a proper purpose under the fair use of doctrine. *Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142, 147 (2nd Cir.1984). Selling the news report does not defeat fair use. *Consumers Union v. General Signal Corp.*, 724 F.2d 1044, 1049 (2nd Cir.1983); *Compare Pacific and Southern Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985). And old news may still be news. *Harper & Row v. Nation Enterprises*, 471 U.S. at 561, 105 S.Ct. at 2230. The aggravating elements in *Harper & Row* were that the user knew the material was copyrighted, knew it came into it by theft and used it deliberately to supplant the right of first publication. These elements are not shown to be present here.

(2) The nature of the copyrighted work.

The plaintiff's work is an original literary work, a speech, an extended piece of oratory.[4] While plaintiff's right to first publication was preserved and executed this fact is of little aid to defendants. The Supreme Court noted, of a speech that had been delivered to the public, that "even substantial quotations might qualify as fair use." *Harper & Row v. Nation Enterprises*, 471 U.S. at 564, 105 S.Ct. at 2232. The defendant did far more than use substantial quotations. While the right of first publication is a very important right it is not the be all and end all of copyright protection.

(3) The amount and substantiality of the portion used in relation to the copyrighted work as a whole.

Here the analysis is quite simple. Defendants used all of one of the derivative works protected under the copyright. *Harper & Row v. Nation Enterprises*, 471 U.S. at 568, 105 S.Ct. at 2234. The only example of fair use of an entire work cited by defendants was utterly dependent on the fact the use was noncommercial. *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 449–50, 104 S.Ct. 774, 792–93, 78 L.Ed. 2d 574 (1984).

(4) The effect of the use upon the potential market for a value of the copyrighted work.

The defendants do not dispute that the market for plaintiff's copyrighted work is adversely affected by their tape. Yet they say it is of no moment because plaintiff has no tapes, packaging or distribution—nothing to indicate he will ever go to market. The language of the statute describing this factor (which is the "single most important element of fair use", *Harper & Row v. Nation Enterprises*, 471 U.S. at 568, 105 S.Ct. at 2234), does not seem to require either an intent or plan to market; it speaks of "potential" markets. *Pacific and Southern Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir.1984). Nevertheless

plaintiff has said he has intended to market his copyrighted work, and the fact that he has yet to take concrete steps to do so seems insignificant today, less than four weeks after the speech was given. In *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2nd Cir.1966) the copyrighted material was over ten years old when injunction against its infringement was sought. The procedural posture of the case (which sought to use a copyright claim to achieve a remedy already sought on other grounds in state court) was unusual and the court had evident doubt that the plaintiff's proposed authorized biography of Howard Hughes would ever be written (303 F.2d at 305, 311). Indeed two of the three judges believed there was "a scheme developed by Hughes and his attorney and employees to prevent the publication of any biography of Hughes." 303 F.2d at 311–12. *Rosemont Enterprises* teaches nothing of value to this case as it now stands.

The analysis of all four factors shows that all but one cut against the fair use doctrine, including the most important factor. On balance the fair use doctrine seems, in all likelihood, inapplicable to defendants' use.

### C

■ Plaintiff's copyright is attacked on grounds that it has been abandoned. "Abandonment of a copyright occurs if the owner intends to give up his copyright protection. Some overt act is necessary to evidence such an intent ... mere inaction is not enough. The presence of a notice is strong evidence of an intent not to abandon ... A limited distribution, even if not widespread enough to effect a forfeiture, can, coupled with the requisite intent, cause an abandonment." *Bell v. Combined Registry Company*, 397 F.Supp. 1241, 1249 (N.D.Ill.1975) (citations omitted), *aff'd*, 536

---

**4.** Plaintiff's copyright application included the speech in the form it was first released to members of the press. That copyright includes the exclusive right "to prepare derivative works based upon the copyrighted work;" (17 U.S.C. § 106(2)) and "in the case of literary ... works

to perform the copyrighted work publicly" (17 U.S.C. § 106(4)) and "to display the copyrighted work publicly" (17 U.S.C. § 106(5)). The speech at the convention was a derivative work and it may well *also* constitute a performance or display.

F.2d 164 (7th Cir.1976). *See generally 3 Nimmer on Copyright* Sec. 13.06 (1988).

It is possible that defendants might prevail on this issue, but it is more probable that they will not. There is no direct evidence of an intent to abandon, and the inaction of plaintiff over a period of no more, and perhaps less, than ten days is too slight to establish abandonment. Failure for the short time here to seek to register copyright really is "mere inaction" which "is not enough." The desire to seek widespread dissemination of the speech is not in the slightest sense inconsistent with intent to maintain a copyright—it is, in fact, the usual goal of an author with a copyright.

**D**

■ The next challenge to the copyright is the claim of forfeiture through publication without copyright notice. It is grounded on the fact a few hundred copies of the speech without copyright notification were distributed and given special force by the fact that the plaintiff's national campaign office receptionist did a good deal of the distributing. The Copyright Act addresses this problem. It provides first that failure to notify does not invalidate the copyright if the notice has been omitted from no more than a relatively small number of copies. 17 U.S.C. § 405(a)(1). The evidence and existing law does not give clear guidance to decision. The plaintiff does have a more than negligible probability of prevailing in an attempt to invoke § 405(a)(1).

More importantly, plaintiff has a reasonable probability of prevailing on the invocation of § 405(a)(2) which saves a copyright where "a reasonable effort is made to add notice to all copies that are distributed to the public ... after the omission has been discovered." There is law to the effect that this rule applies only to continuous production of identical products, (*Eastern Publishing and Advertising, Inc. v. Chesapeake Publishing and Advertising, Inc.*, 831 F.2d 488, 491 (4th Cir.1987)), but the statute contains no such limitation and there are cases which do not apply the limitation. *Werlin v. Reader's Digest Ass'n*, 528 F.Supp. 451 (S.D.N.Y.1981); *See Hagendorf v. Brown*, 707 F.2d 1018 (9th Cir.1983). The less than perfect efforts of the plaintiff to add the required notice to copies of the speech seem likely to be found reasonable. The failure to attempt to recover and mark prior copies in the hands of others is consistent with the statute. *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 195–97 (2d Cir. 1985); *E. Mishan v. Marycana, Inc.*, 662 F.Supp. 1339, 1343 (S.D.N.Y.1987).[5]

**E**

■ The final[6] offering of defendants is that, if there is a copyright and plaintiff holds it, they are innocent infringers and so no injunction should issue. Rather there should be a compulsory royalty ordered paid by them to plaintiff. 17 U.S.C. § 405(b) states, in pertinent part:

Any person who innocently infringes a copyright, in reliance upon an authorized copy ... from which the copyright notice has been omitted, incurs no liability for actual or statutory damages ... for any infringing acts committed before receiving actual notice that registration for the work has been made ... if such person proves he ... was misled by the omission of notice. In ... such a case the court ... may enjoin the continuation of the infringing undertaking or may require as a condition for permitting the continuation of the infringing undertaking, that the infringer pay the copyright owner a

**5.** Plaintiff apparently cannot rely upon § 405(a)(3) to excuse the actions of the Democratic National Committee in failing to add the copyright notification to its copies of the speech because its demand to the Committee was not in writing. Section 405(a)(3) excuses the lack of notification when it occurs in violation of the copyright holder's written requirement that it be included.

**6.** Defendants originally argued that the plaintiff's receipt of federal funds precluded copyright of his speech on 17 U.S.C. § 105. This position is not argued in the latest brief and appears untenable. *See Schnapper v. Foley*, 667 F.2d 102 (D.C.Cir.1981).

reasonable license fee ... fixed by the court.

The defendants have at trial a good chance to show they are innocent infringers. No copy of the speech they saw (all apparently on film) contained a copyright notification. They received what they reasonably believed to be a license to copy and sell Jackson's speech. They invested money and time in their project to market the speech. On the other hand, the responses of the defendants to Jackson's protests may well evince an attitude of callous disregard toward Jackson's copyright. Nor can the Court determine how great are the defendants' expenditures, what right they have to recoup some of them and how substantial a burden their expenses are to them. In light of the purpose of the provisions of § 405(b), *i.e.,* to give the courts broad discretion to balance the equities within the framework of section 405 (*Beacon Looms, Inc. v. S. Lichtenberg Co.,* 552 F.Supp. 1305, 1314 (S.D.N.Y.1982)), I find that the plaintiff has a greater than negligible chance of gaining injunctive relief rather than a compulsory royalty.

### VI

### A

The plaintiff's claim to the right of publicity is problematic. It is based upon the plaintiff's right to use his own name and likeness for his own benefit, and this right is violated when one, without leave, uses it for his benefit and not the plaintiff's. *Winterland Concession Co. v. Sileo,* 528 F.Supp. 1201 (N.D.Ill.1981), *aff'd in part, and rev'd in part on other grounds,* 735 F.2d 257 (7th Cir.1984). Public figures possess this right with respect to commercial use of their names and likeness. *Estate of Presley v. Russen,* 513 F.Supp. 1339 (D.N.J.1981). But public figures do not retain the right of publicity against the use of name and likeness in the news media. *Rosemont Enterprises v. Random House, Inc.,* 58 Misc.2d 1, 294 N.Y.S.2d 122, 129 (1968) *aff'd* 32 A.D.2d 892, 301 N.Y.S.2d 948 (1st Dept.1969). In more concrete terms the right to publicity would not permit plaintiff to challenge the use of his picture on the cover of Time or Newsweek. In light of the fact that the evidence appears to support defendants' claim that they were engaged in news reporting the chances of success on the right to publicity claim appear less than negligible.

### B

A better theory for plaintiff is that Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) has been violated by the false implied representation that he has authorized or approved defendants' tape. Defendants' reply that no reasonable person could conclude that plaintiff sponsored defendants' cassettes simply because his picture is on the box. The use of the plaintiff's name and likeness on the tape package may not be quite as clearly an implied endorsement as occurred in *Geisel v. Poynter Products, Inc.,* 283 F.Supp. 261 (S.D.N.Y.1968) ("Dr. Suess") and may be more of an implied endorsement than in *Allen v. National Video, Inc.,* 610 F.Supp. 612 (S.D.N.Y.1985) (Woody Allen). This Court has examined the tape package and finds that its appearance is more than sufficient to create the likelihood that confusion will occur: the public may well believe the tapes were approved or produced by plaintiff. The manner in which his name and picture are printed, the layout and the other material on the package are convincing on this point. In fact, there is evidence of confusion not only from members of the public who called plaintiff's campaign office wishing to secure the tape, but also from the receptionist at the campaign office who apparently believed plaintiff approved the tape. The main thrust of this argument is that the remedy is not injunction but disclaimer. No proposed disclaimer was offered in evidence. But an appropriate form of disclaimer would be an adequate remedy and once approved by this Court would obviate the need for injunctive relief insofar as the Lanham Act is concerned. *Consumers Union of U.S. v. General Signal Corp.,* 724 F.2d 1044, 1053 (2d Cir.1983).

For the reasons stated above a preliminary injunction shall issue upon the same

terms and conditions as the temporary restraining order except that the bond to be posted by plaintiff shall be increased to the amount of $25,000. A draft Injunction Order shall be prepared by plaintiff and shall refer to these Findings of Fact and Conclusions of Law. Hearing on the Permanent Injunction shall be scheduled for August 30, 1988.