**TY, INC., Plaintiff,**

v.

**GMA ACCESSORIES, INC., and Paul Harris, Defendants.**

**No. 96 C 8465.**

United States District Court,
N.D. Illinois,
Eastern Division.

April 8, 1997.

James Patrick White, Welsh & Katz, Ltd., Chicago, IL, for plaintiff.

Mark T. Banner, Marc Scott Cooperman, Timothy C. Meece, Banner & Witcoff, Ltd., Chicago, IL, for defendants.

## OPINION AND ORDER

NORGLE, District Judge:

"All animals are equal but some animals are more equal than others." George Orwell, *Animal Farm*, ch. 10 (1945). Perhaps Plaintiff Ty, Inc. ("Ty") would agree.

Before the court is Ty's Motion for Preliminary Injunction and Expedited Discovery. For the following reasons, the motion is granted.

## I. BACKGROUND [1]

Ty manufactures "Squealer the Pig" ("Ty Pig") and "Daisy the Cow" ("Ty Cow"), soft-sculptured "bean bags" which Ty sells as part of its "The Beanie Babies Collection" ("Beanie Babies"). Ty is the owner of registered copyrights for both of those bean bags.[2]

Defendant GMA Accessories, Inc. ("GMA"), manufactures "Preston the Pig" ("GMA Pig") and "Louie the Cow" ("GMA Cow"), also soft-sculptured bean bags, which GMA sells as part of its "Floppy Friends" collection.[3]

Ty entered a licensing agreement with another company, which is not in the business of manufacturing toys ("Company X"), which allows Company X to use some Beanie Babies designs or trademarks for promotional purposes in Company X's business. Company X's license is effective for a fixed period of time, requires Company X to place a Ty tag on each of the Company X promotional products, and requires that the Company X promotional products will be of a recognizably different size than actual Beanie Babies; and Company X will not produce any bean bag toys, other than the Company X promotional products, for a period of a year after the end of the promotion. Insuper, Ty has approval rights over the Company X promotional products. The agreement includes an acknowledgment by Ty and Company X that the integrity of the Company X promotional products and their materials are important. The agreement also includes a requirement that Company X will include a notation on the packaging of its promotional products that Beanie Babies are available at finer retail stores. Marketing and advertising material will also contain such a notation. In addition, the agreement provides that Ty does not confer any of Ty's intellectual property, including copyrights, to Company X.

Ty submits that GMA's Pig and Cow are virtually identical to Ty's Pig and Cow. Ty states that Defendant Paul Harris ("Paul Harris"), a store located in shopping malls, displayed and offered for sale both the GMA Pig and the GMA Cow.

In short, Ty brings this action for copyright infringement, claiming that the GMA

---

**1.** The parties have filed their briefs under seal. The court has made every effort to maintain confidentiality while including information necessary for the rendering of this Opinion and Order.

**2.** Ty attached to its brief copies of the Registration Certificates for the Ty Pig and the Ty Cow.

**3.** The court notes that both Ty and GMA produce other bean bag Beanie Babies and Floppy Friends, respectively, which are not at issue in the instant case. For purposes of the instant opinion, the court considers only the pigs and cows.

Pig and the GMA Cow infringe upon Ty's copyrights.[4]

After filing suit regarding the cows, in an informal attempt to resolve their cow dispute, Ty contacted GMA and Paul Harris, requesting that they cease sale of the GMA Cow. GMA, although denying wrongdoing, later agreed to stop selling the GMA Cow by letter of January 8, 1997, and removed the GMA Cow from Paul Harris shelves. When pre-litigation attempts at informal resolution of the pig dispute were unsuccessful, Ty amended its Complaint to include allegations regarding the GMA Pig. The instant Complaint charges copyright infringement of both the Ty Pig and the Ty Cow.

Ty moves for entry of a preliminary injunction prohibiting Defendants from "importing, manufacturing, distributing, marketing, and selling ... products which infringe upon [Ty's Beanie Babies copyrights], and requiring ... Defendants to produce all copies or reproductions of the [Floppy Friends], all patterns and other means for producing such copies and all advertisements and promotional literature therefor to the Court for impoundment." (Mem. Supp. Mot. Prelim. Inj. at 3.)

## II. DISCUSSION

In order for the court to enter a preliminary injunction, the movant must demonstrate that (1) it is likely to succeed on the merits, (2) it has no adequate remedy at law, and (3) it will suffer irreparable harm in the absence of preliminary relief. *Publications Int'l, Ltd. v. Meredith Corp.,* 88 F.3d 473, 478 (7th Cir.1996). If the movant demonstrates these elements, the court then balances the irreparable harm to the movant against the harm which would be suffered by the non-movant, as well as non-parties, if preliminary relief is granted. *Id.* The court uses a "sliding scale" approach to this balancing; that is, "the more likely it is that [the movant] will succeed on the merits, the less the balance of irreparable harms need weigh toward its

side...." *Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992).

### A. Likelihood of Success on the Merits

The manufacture, distribution and/or sale of an unauthorized copy which is substantially similar to a protected work infringes on the copyright in the work. *See* 17 U.S.C. §§ 106, 501(a); *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502 (7th Cir.1994) (finding copyright infringement of soft-sculptured animal heads and tails on duffel bags); *Atari, Inc. v. North Am. Philips Consumer Elec. Corp.,* 672 F.2d 607, 614 (7th Cir.1982). In order to establish copyright infringement, a plaintiff must demonstrate that it owns a valid copyright, and that the defendant copied the protected work. *Wildlife Express,* 18 F.3d at 507.

#### 1. Copyright Protection

Following the *Wildlife Express* analysis, the court first considers the validity of Ty's claimed copyright. *See Id.* Certificates of registration, such as those submitted by Ty, are *prima facie* evidence of valid copyrights. *Id.* (citing 17 U.S.C. § 410(c)). Although such evidence may be rebutted, *id.,* Defendants make no attempt to do so. As such, the court accepts Ty's supported assertion that the Ty Pig and the Ty Cow are protected.

#### 2. Copying

Again, to demonstrate copyright infringement, after establishing that a work is protected, a plaintiff must demonstrate that the defendant copied the protected work. Because direct evidence of copying is often unavailable, courts look for an inference of copying in circumstantial evidence. *See Atari,* 672 F.2d at 614. Courts may infer copying where (1) the defendant had access to the protected work and (2) the accused work is substantially similar to the protected work. *Id.* Courts may not draw such an inference where (1) the accused work arose independently without copying or (2) the sim-

---

**4.** For clarification, the court notes that Ty's Complaint does not claim copyright protection of the entire "animal bean bag" concept, or even of the pig/cow bean bag concept, but, rather, only of its particular pig and cow designs for such bean

bags. *See Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 507–508 (7th Cir.1994) ("[T]he Copyright Act protects the expression of ideas, but exempts the ideas themselves from protection.")

ilarities between the two works are insufficient to demonstrate copying. *Wildlife Express*, 18 F.3d at 508.

### a. Access

■ Defendants dispute that they had access to the Ty Pig and the Ty Cow when creating the GMA Pig and the GMA Cow. Rather, Defendants contend that the GMA Pig and the GMA Cow arose independently. In response, Ty argues that Defendants had access to the Ty Cow and the Ty Cow due to the Beanie Babies' tremendous success. Ty also avers that Paul Harris had been a Beanie Babies customer of Ty's; shortly after Ty dropped Paul Harris as a customer, Paul Harris began selling the GMA Pig and the GMA Cow.

Broad public display of a product may give rise to an inference of access. *Eve of Milady v. Impression Bridal, Inc.,* 957 F.Supp. 484, 488–89 (S.D.N.Y.1997) (inferring access from placement of a national magazine advertisement for copyrighted product); *see also Gaste v. Kaiserman,* 863 F.2d 1061 (2d Cir. 1988) (noting that access may be inferred from longstanding and wide dissemination). *Cf. Selle v. Gibb,* 741 F.2d 896 (7th Cir.1984) (holding that limited play of a song inadequate to demonstrate access). A demonstration of access does not require proof of actual viewing, but proof of the opportunity to view the copyrighted work. *Wildlife Express,* 18 F.3d at 508. Further, a strong inference of access arises when an accused work is virtually identical to the copyrighted work. *Gaste,* 863 F.2d at 1067.

Ty states that the Beanie Babies have enjoyed tremendous success since their introduction in 1993. Defendants do not dispute that Beanie Babies have been successful, and Ty submits several news articles regarding the subject. *See, e.g.,* "Beanie Mania," *People,* July 1, 1996, at 84 ("Beanies seem to be the next blip on the hula hoop-Pet Rock–Rubik's Cube–Cabbage Patch Doll toy-of-the-moment continuum"); Genevieve Buck, "Tabasco is Sauciest of Hot Toys," *Chi. Trib.,* May 2, 1996, at Business 1 ("'I've been through trolls; they're nothing compared to this'."); Reon Carter, "Scoop—Bean Bag Lovables," *The Cincinnati Enquirer,* June 19, 1995, at C01 ("The most popular [Beanie Babies] are Patti the Platypus, Squealer the Pig, Flash the Dolphin and Legs the Frog"). Indeed, in his affidavit, the president of GMA states, "GMA started selling Floppy Friends animals in 1996. I had heard that bean bag animals were selling well in the industry, and we decided to design some of our own and see how they sold." (Altirs Decl.)

Defendants state that Ty's assertion regarding Paul Harris as a Ty customer is "simply a red herring" because it was GMA, rather than Paul Harris, which designed the accused animals. Also, Defendants state that Ty's reliance on its success for an inference of access constitutes "double circumstantial" evidence upon which the court should not rely. That is, Defendants assert that wide dissemination is merely (unreliable) circumstantial evidence of access, and access is merely (unreliable) circumstantial evidence of copying.

Notwithstanding, the court takes judicial notice of the several news articles submitted by Ty. The existence of these articles demonstrates that Beanie Babies are a widely-disseminated popular item. In addition, as discussed below, the court finds that the Ty and GMA cows are virtually identical. From this, the court infers that Defendants had access to the Ty products.

### i. Independent Creation

■ Defendants contend that, regardless of access, they did not copy the Ty animals. Rather, they assert that the GMA Pig and the GMA Cow arose independently, through GMA's full-time product designers.

Defendants state nothing in support of their assertion of independent creation of the GMA Cow. Rather, they state simply that the GMA Cow designer no longer works for GMA. Such a statement does not support a claim of independent creation; for purposes of the instant motion, the court finds that Defendants have not shown that the GMA Cow was independently created.

Regarding the GMA Pig, like the GMA Cow, Defendants state a GMA designer originated the GMA Pig design independently. According to Defendants, the designer, an

artist, drew inspiration from various books and photographs as well as the Academy–Award–nominated talking animal movie *Babe,* which she watched several times. All of those sources depicted live pigs. The court notes that the pigs at issue do not appear live at all—they are stylized fanciful representations of live pigs. According to Defendants, the designer had not seen or heard of Beanie Babies until after she designed the GMA Pig.

When reproduction of a live creature is at issue, "a copyright holder must ... prove substantial similarity to those few aspects of the work that are not *required* by the idea." *Wildlife Express,* 18 F.3d at 508 (emphasis in original) (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600–607 (1st Cir.1988)). The more particularized the expression of the idea, the more protection it receives. *Id.* The court notes that, although the bean bags clearly represent live pigs and live cows, they do not appear "real" in many aspects. They do, however, resemble each other.

Defendants submit the drawing created by its designer for her plush bean bag pig in support of their independent creation argument. However, the drawing does not accurately represent the actually-produced GMA Pig submitted as an exhibit. There are several differences between the designer's drawing and the GMA Pig. In the drawing, the nose is circular with small, round, black embroidered nostrils; the actual GMA Pig has an oval nose with one-half inch line pink embroidered nostrils (as does the Ty Pig). There is one center seam running down the middle of the head and snout of the drawing; the GMA Pig has two seams running from the back of the head to the nose, divided by another seam across the bridge of the snout (as does the Ty Pig). The head in the drawing is spherical with a short snout; the head of the GMA Pig is more triangular with a long snout (as is the Ty Pig's). The ears in the drawing are placed half-way down the head; the ears of the GMA Pig are closer together on the top-side of the head (as are the Ty Pig's).[5]

Although the drawing may be different from the Ty Pig, that drawing does not represent the actual GMA Pig product. It is the products which the court must compare, as Ty contends that the GMA Pig product, rather than its drawing, infringes on Ty's copyright. Indeed, the drawing simply emphasizes the similarities of the two products. Defendants submission of the live pig photographs and the movie *Babe* does not convincingly support its argument of independent creation, as the GMA Pig looks more like the Ty Pig than it does like a live pig. Like the GMA product, Defendants' attempt at demonstrating independent creation is "full of beans."

*b. Substantial Similarity* [6]

Defendants also dispute that the GMA Pig and the GMA Cow are substantially similar to the Ty Pig and the Ty Cow. As stated in *Wildlife Express,* courts determine whether two works are substantially similar by applying the "ordinary observer" test: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Wildlife Express,* 18 F.3d at 509 (quoting *Atari,* 672 F.2d at 614). That is, courts look to whether the ordinary observer would tend to overlook the disparities, unless setting out to detect them, and to regard the aesthetic appeal of the two works as the same. *Id.* The court recognizes that some "consumers are ignorant or inattentive, so some are bound to misunderstand no matter how careful the producer is." *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616, 618 (7th Cir.1995). It is not the perspective of such consumers, or observers, which the court considers in the instant case; rather, it considers simply "ordinary" observers. Infringement does not require that the two works be identical; rather, it

**5.** Further similarities and differences are discussed *infra.*

**6.** For purposes of determining substantial similarities, the court considers several photographs of the works as well as samples of them, all of which were provided by the parties.

requires only substantial similarity. *Id.* at 511.

■ Relying on a 1980 case from the Western District of Pennsylvania, Defendants assert that the court must demand expert testimony for purposes of determining whether the bean bags are substantially similar. *See Testa v. Janssen,* 492 F.Supp. 198, 203 (W.D.Pa.1980) (requiring expert testimony where movant submits only indirect evidence of access). The court disagrees. The instant plush animal bean bags are not at all technical in nature so intricate as to require specialized knowledge for purposes of analysis.[7]

*i. Pigs*

■ The two pigs are quite similar. Both are made of the same, short-pile plush material. The pattern pieces used to create the two, with the exception of their feet, appear identical.[8] The stitching, again with the exception of the feet, is identical. The placement of the eyes, ears, and tail is identical. The nose is identical, with the same nostril stitching. The shape of the stuffed heads is identical. Both have knotted tails which symbolize the "corkscrew" effect of a live

pig's tail. Without the use of a scale, even the weight of the two seem the same.

There are some differences between the Ty Pig and the GMA Pig. Color is the most noticeable of those differences. The Ty Pig is pale pink with a dark pink nose and ears. The GMA Pig is white with a pale pink nose. The ears on the GMA Pig are pale pink on the inside, and white on the outside. Unlike the Ty Pig, the GMA Pig has pale pink feet, which contrast with its white body. On those feet appears black stitching which suggests the toes, or cloven feet, of a live pig. The tail on the Ty Pig is sewn flat and positioned one-half inch above the meeting point of the leg and back seams, whereas the GMA Pig's tail is sewn in a round fashion and positioned one inch above the meeting point. The body of the Ty Pig is slightly less plump than that of the GMA Pig. The tags on the two pigs are also different: the Ty Pig has a red, heart-shaped, Ty "Beanie Baby" tag; the GMA Pig has a square, blue "Floppy Friends" tag.[9] It is there, however, that any noticeable differences stop.[10] "Superficial changes" to the characteristics of a copyrighted work in an accused work may be considered "an attempt to disguise an intentional appropriation." *Atari,* 672 F.2d at

---

7. *See* Fed. R. Ev. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.")

8. Unlike the district court in *Wildlife Express,* the court did not dissemble the animals at issue in order to compare their patterns. It is so clear from mere side-by-side comparison and measurement that the Ty and GMA pattern pieces virtually match, that the court finds such an autopsy unnecessary.

9. Ty notes that the tags instruct consumers to remove the tags from the bean bags before use.

10. Defendants assert several differences which appear in the photographs of the GMA Pig submitted by Defendants. However, these differences do not appear in the actual, three-dimensional plush GMA Pig submitted as an exhibit.

Defendants state that the GMA Pig "has a shorter snout that angles down toward the body, the Ty pig has a longer snout that angles out

away from the body." Defendants also state that the GMA Pig has a smaller, more rounded head than the Ty Pig. Defendants further aver that the GMA Pig has differently shaped, differently positioned and larger ears than the Ty Pig. Defendants also contend that the GMA Pig is smaller in overall length than the Ty Pig.

In short, these "differences" do not exist to any reasonably noticeable extent. The court has taken at least twenty measurements of the actual pigs and their body parts. With the exceptions noted in the text, within .25 inches, the measurements are the same. For example, both pigs measure approximately 9.25 inches from tip-of-nose to tip-of-tail. Both have ears approximately two inches apart. Both have ears approximately one inch long. From the bottom neck seam to the point where leg and back seams meet, both pigs measure 5.25 inches. The ears are located on the side head seam, one inch from the eye. The nose is approximately 1.25 inches across. The nostril stitches are one-half inch long. The bottom head seam is two inches long. These measurements are not as precise as an engineer's might be, but for purposes of establishing substantial similarity based on the ordinary observer test, the court finds that the size of the two pigs is the same.

619.[11]

Again, where a depiction of a live creature is at issue, the court focuses on the aspects of the work which are not required in the depiction of that creature. *Wildlife Express,* 18 F.3d at 508. The more particularized the expression of the idea, the more protection courts afford that expression. *Id.* Pigs are live creatures. The bean bag pigs do not look "real." The Ty Pig has several aspects which are not required in the depiction of a live pig: unique overall size and shape, knotted tail, feature placement, feature size, feature shape, stitched nostrils, seaming and pattern pieces. Given the striking similarity of the two pigs, for purposes of the instant motion, the court finds that the ordinary observer would overlook the differences, and regard the aesthetic appeal of the two pigs as the same. Thus, they are substantially similar.

### ii. Cows

Quite frankly, the court cannot tell the two cows apart, and Defendants do not attempt to dispute their substantial similarity. Upon very careful examination, the court finds the following differences: the Ty Cow has pale tan horns, whereas the GMA Cow has pale pink horns; the Ty Cow has a flat tail, whereas the GMA Cow has a round tail; the GMA Cow's spot is slightly larger than the Ty Cow's; the GMA Cow's body is slightly plumper than the Ty Cow's; the GMA Cow's muzzle is slightly flatter than the Ty Cow's; and, like the pigs, the cows have different removable tags.

### B. Adequacy of Legal Remedies

■ Ty asserts that legal remedies are inadequate to repair the damage which may be caused in the absence of an injunction. It is Ty's argument that, by inundating consumers with inferior quality Beanie Babies lookalikes, Defendants' alleged infringement will destroy the "niche" Ty has created in the toy market.

Ty maintains that it has achieved its success through careful marketing strategy. Ty states that it directs its marketing efforts at high-end stores, limits the number of Beanie Babies (including the Ty Pig and the Ty Cow) available for sale, and emphasizes the Beanie Babies' status as a collection. In support of those statements, Ty submits the following article: Gary Samuels, "Mystique Marketing," *Forbes,* October 21, 1996, at 276 ("[Ty's] strategy here is empty shelves—the deliberate creation of scarcity, which pumps up word-of-mouth demand to a frenzied level").

Ty contends, "When an item which looks substantially or exactly like one of Ty's Beanie Babies is sold in bins at clothing or discount stores, in mass quantities at lower prices, and is of lower quality, it destroys not only the collectible market created by Ty but the inherent value of Ty's copyrights themselves, because Ty's designs will no longer be considered unique by the public, and therefore are no longer desirable as a collectible item." (Ty Mem. Supp. Prelim. Inj. at 8.)

Insuper, states Ty, if any of the GMA pigs and cows are defective, Ty's reputation for quality goods will be injured, as consumers are likely confuse the GMA pigs and cows with the Ty pigs and cows. Ty avers that consumers will attribute GMA defects to Ty. Ty also states that its Beanie Babies business accounts will likely lead to future accounts for other Ty products. Ty argues that the value of such future accounts will never be known if GMA is able to usurp the Beanie Baby accounts through the use infringing products.

Ty asserts that the harms described above would be extremely difficult to calculate the value of such harm in dollars. The court agrees, given the difficulty of quantifying such harm.

### C. Irreparable Harm

■ As Ty contends, courts may ordinarily presume that all damages incurred due to copyright infringements are irreparable, and therefore not susceptible to monetary measurement, rendering any legal remedy inade-

---

**11.** Defendants state that its pig is sold with a pink ribbon around its neck. There is no ribbon on the GMA Pig exhibit, and Ty states that the GMA Pig exhibit had no ribbon when purchased at a Paul Harris store. Even if the GMA Pig has a ribbon, the court would still find the two products substantially similar.

quate. *See Atari,* 672 F.2d at 620 (7th Cir. 1982); *ISC–Bunker Ramo Corp. v. Altech, Inc.,* 765 F.Supp. 1310, 1320 (N.D.Ill.1990). A presumption of irreparable harm may arise upon a showing of likelihood of success on the merits and a *prima facie* case. *See Jackson v. MPI Home Video,* 694 F.Supp. 483, 488 (N.D.Il.1988). Even if the court does not presume irreparable harm, Ty has made a sufficient showing of such harm.

Defendants assert that Ty cannot show irreparable harm regarding the cow because, as GMA's counsel advised Ty by letter, GMA has ceased selling, manufacturing, or marketing the GMA Cow. "[W]hen Ty filed it motion for preliminary injunction, its principals already knew that the accused Floppy Friend cow was no longer being sold by the defendants. That is, for the cow, there are no ongoing acts by the defendants for this Court to enjoin." This argument overlooks the notion that, absent an injunction, GMA may resume selling, manufacturing, or marketing the GMA Cow.

For purposes of the instant motion, the court finds that the harm allegedly caused by Defendants will indeed be irreparable. As discussed above, the GMA Pig and the GMA Cow may injure Ty's reputation and destroy the market for its entire line of Beanie Babies. Further, it may damage Ty's current business relationships. Accordingly, the court finds that Ty made an adequate showing of irreparable harm, and therefore of inadequacy of legal remedies.

### 1. Effect of Licensing Agreement

■ Defendants contend that Ty has already placed a price on the heads of its Beanie Babies by entering into the licensing agreement with Company X. In the context of the specific licensing agreement at issue, the court disagrees.

Defendants are correct that, at least generally in patent cases, the grant of a license rebuts the presumption of irreparable harm. *See High Tech Med. Instr., Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1557 (Fed. Cir.1995). Licensing of a copyright indicates that the copyright holder has exchanged its right to exclusivity under its copyrights for money. The right to exclude is the basis for the presumption of irreparable harm. *T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.,* 821 F.2d 646, 648 (Fed.Cir. 1987). Defendants imply that, because Ty has sold some of its rights to Company X, that Ty has placed a price on the exclusivity of the Ty Pig and the Ty Cow copyrights.

However, unlike the cases which find that a license has rebutted a presumption of irreparable harm, under the instant licensing agreement, Ty has not surrendered its exclusive rights over the products at issue. Ty avers that its pig and the cow have not been licensed. Only ten of the approximately one hundred Beanie Babies are subject to the licensing agreement. The licensing of one Beanie Baby does not waive Ty's copyrights to other Beanie Babies, including the Ty Pig and the Ty Cow.

Furthermore, there are several provisions in the licensing agreement which indicate that Ty has not sold its copyrights over the Beanie Babies at issue. Ty has not licensed any Beanie Babies for *sale* by Company X: under the licensing agreement, Company X will *give away* products using Beanie Baby designs. In addition, unlike the GMA Pig and the GMA Cow, the Company X promotional products will not be of the same size as actual Beanie Babies. Moreover, the Company X promotional products must feature a tag featuring the Ty logo and information. Company X must also advertise the Beanie Babies are available at finer retail stores. Significantly, Ty has retained strict control and approval rights over the design, development, and manufacture of the Company X promotional products. The license to Company X lasts for a limited duration. The licensing agreement contains a notation that Ty is not giving any of its intellectual property rights to Company X. Unlike the GMA situation, Ty expects that the careful promotion of the licensed products, in conjunction with Ty's name and copyrights, will actually increase the status of Beanie Babies as a collectible and increase public recognition of Ty as a creator and provider of plush toys, thereby increasing the value of Ty's copyrights.

Ty has not allowed Company X to manufacture and sell actual Beanie Babies as though they belong to Company X. In particular, Ty has not licensed its pig or its cow to Company X at all. Ty has not placed a price on the heads of Beanie Babies, exchanging its right to exclusivity for money. As such, the court finds that the licensing agreement does not rebut the presumption of irreparable harm.

### D. *Balancing of Harms*

#### 1. *Harm to Defendants*

■ Regarding the GMA Cow, Defendants have already stated that they are not currently manufacturing, marketing, or selling the allegedly infringing cow. As such, Defendants will suffer no harm if the court preliminarily enjoins them from selling the cow.

Moreover, Defendants will not likely be harmed, where Ty has shown that it is likely to succeed in demonstrating that Defendants are misappropriating Ty's copyrights. Loss of profits from infringing products warrant little consideration in the balancing of harms analysis. *Atari,* 672 F.2d at 620.

However, if the GMA Pig and the GMA Cow are found not to infringe on Ty's copyrights, GMA may suffer some lost sales of those two Floppy Friend products. Unlike Ty, GMA does not contend that it will suffer damage to its reputation or lost future business. GMA's lost sales could reasonably be calculated and deducted from a bond posted by Ty. In balancing that potential harm against the potential harm to Ty, discussed *supra,* the court finds that the balance tips in favor of the injunction.

#### 2. *Public Interest*

■ In addition to the foregoing analysis, when determining whether equitable relief is appropriate, the court must also give high regard to the public interest. *August Storck,* 59 F.3d at 619. The general public is a great beneficiary of competition. *Id.*

However, the court also considers that the public should not be deceived into participating in "competition" by purchasing one product, thinking it is a different product. Confusion in the marketplace and of consumers inevitably results from copyright infringement. *E.g., Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 18 (7th Cir.1992); *Jackson v. MPI Home Video,* 694 F.Supp. 483, 488 (N.D.Ill.1988). Given the substantial similarity of the products at issue, the court finds that the public would likely be confused by the two cow and pig products. The court finds that the public interest weighs in favor of a preliminary injunction.

### III. CONCLUSION

■ For the foregoing reasons, the court grants the Motion for Preliminary Injunction and Expedited Discovery. Ty has demonstrated (1) a likelihood of success on the merits, (2) the inadequacy of legal remedies, and (3) that it will suffer irreparable harm absent the preliminary injunction.

Accordingly, Ty has met its burden of demonstrating that a preliminary injunction is appropriate. Defendants shall not import, manufacture, distribute, market, or sell its Preston the Pig or Louie the Cow. Defendants shall produce all copies or reproductions of the GMA Pig and the GMA Cow, all patterns and other means of producing such copies, and all advertisements and promotional literature therefor to the court for impoundment.

GMA shall make a recommendation to the court regarding an appropriate dollar amount for a preliminary injunction bond to be posted by Ty on or before May 1, 1997. The parties shall appear for status on May 2, 1997, at 9:30 a.m. Defendants are preliminarily enjoined from sending either "Preston the Pig" or "Louie the Cow" to market.

IT IS SO ORDERED.